```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
                                     :
UNITED STATES OF AMERICA                    SEALED
                                     :
           - v. -                           SUPERSEDING INDICTMENT
                                     :
ALIREZA SHAHVAROGHI FARAHANI,               S1 21 Cr. 430 (RA)
     a/k/a "Vezarat Salimi,"         :
     a/k/a "Haj Ali,"
MAHMOUD KHAZEIN,                     :
KIYA SADEGHI,
OMID NOORI, and                     :
NILOUFAR BAHADORIFAR,
     a/k/a "Nellie,"                :

                Defendants.         :

                                     :
- - - - - - - - - - - - - - - - - - x
```

## BACKGROUND

1.      The charges in this Indictment arise out of a
scheme by the Government of the Islamic Republic of Iran to
target dissidents who oppose the regime's violations of human
rights, suppression of democratic participation and freedom of
expression, and corruption.  The regime has targeted such
individuals for harassment, intimidation, and incarceration,
among other tactics.  In recent years, the regime has also
targeted its perceived opponents residing outside Iran for
kidnapping and capture.  As described more fully below, in at
least the last two years, Iranian intelligence services have
lured Iranian expatriates lawfully residing in other countries

to travel to locations where they could be captured, imprisoned in Iran, and executed.

2.    As part of this scheme, the Government of Iran has targeted a journalist, author, and human rights activist residing in Brooklyn, New York ("Victim-1"). Victim-1 is a U.S. citizen of Iranian origin. Victim-1 has publicized the Government of Iran's human rights abuses; discriminatory treatment of women; suppression of democratic participation and expression; and use of arbitrary imprisonment, torture, and execution to target its political opponents; and has sought to mobilize public opinion in Iran and around the world to bring about changes to the regime's laws and practices.

3.    In approximately 2018, Iranian government officials attempted to induce relatives of Victim-1, who reside in Iran, to invite Victim-1 to travel to a third country, apparently for the purpose of having Victim-1 arrested or detained and transported to Iran for imprisonment. Iranian government officials offered to pay Victim-1's relatives in exchange for their invitation to Victim-1, but Victim-1's relatives did not accept the offer.

4.    On or about July 29, 2019, the Chief of the Revolutionary Courts in Iran publicly stated that anyone who sent videos considered against the regime, in particular videos contrary to the Government of Iran's criminal laws mandating

2

that women and girls wear head coverings in public, to Victim-1 was committing the crime of cooperating with a hostile foreign government and would be sentenced from one to 10 years' imprisonment.

5.      In approximately September 2019, a relative of Victim-1 was arrested by Iranian government officials on charges purportedly based on the relative's association with Victim-1. Victim-1's relative was later sentenced to eight years' imprisonment.

6.      Since at least June 2020, the Government of Iran has plotted to kidnap Victim-1 from within the United States in furtherance of the regime's efforts to silence Victim-1. On multiple occasions in 2020 and 2021, agents of the Government of Iran procured the services of private investigators to surveil, photograph, and video record Victim-1 and Victim-1's household members in Brooklyn, New York, as part of the plot to kidnap Victim-1 for rendition to Iran. These agents of the Government of Iran procured the surveillance by misrepresenting their identities and the purpose of the surveillance to the investigators and laundered money into the United States from Iran in order to pay for the surveillance, photos, and video recordings of Victim-1.

7.      As part of the kidnapping plot, the agents of the Government of Iran involved in obtaining surveillance of Victim-

3

1 and Victim-1's household also researched methods of kidnapping Victim-1 for rendition to Iran. One agent of the Government of Iran, for example, researched travel routes from Victim-1's residence to a waterfront neighborhood in Brooklyn, New York. Another agent of the Government of Iran researched a service offering military-style speedboats for self-operated maritime evacuation out of Manhattan, New York; and maritime travel from New York to Venezuela, a country whose de facto government has friendly relations with the regime in Iran.

**THE DEFENDANTS**

8. ALIREZA SHAHVAROGHI FARAHANI, a/k/a "Vezarat Salimi," a/k/a "Haj Ali," the defendant, is a resident of Iran and an Iranian intelligence official. FARAHANI manages a network of sources for Iranian intelligence, including MAHMOUD KHAZEIN, OMID NOORI, and KIYA SADEGHI, the defendants, in their actions targeting Victim-1.

a. An electronic device used by FARAHANI contains, among other things, a graphic showing a photograph of Victim-1 along with Iranian nationals Ruhollah Zam and Jamshid Sharmahd, and the caption, in Farsi, "Gradually the gathering gets bigger... Are you coming, or should we come for you?" Both Zam and Sharmahd were Iranian dissidents who were publicly critical of the regime. Zam, a resident of France with refugee status, was lured by Iranian intelligence services to leave

4

France in October 2019.  While travelling abroad, Zam was

captured by Iranian intelligence services, imprisoned in Iran,

and executed by the Iranian Government in December 2020.

Sharmahd, a lawful resident of the United States, was lured by

Iranian intelligence services to leave the United States in July

2020.  While travelling abroad, Sharmahd was captured by Iranian

intelligence services and remains imprisoned in Iran.  In a

broadcast on Iranian state-owned television on or about August

1, 2020, the Iranian Minister of Intelligence and head of Iran's

Ministry of Intelligence and Security ("MOIS"), Mahmoud Alavi,

publicly claimed MOIS's responsibility for Sharmahd's capture,

describing it as one of many "complex operations in striking

dissidents."  In the same public statement, Alavi claimed the

Government of Iran's responsibility for the 2015 assassination

of an Iranian expatriate in the Netherlands.

    b. FARAHANI has received surveillance

photographs of Victim-1 and Victim-1's residence from his co-

conspirators and directs the Iranian intelligence network with

respect to its targeting of Victim-1.

    c. The network that FARAHANI directs has also

targeted individuals in other countries, including Canada, the

United Kingdom, and the UAE.  Beginning in at least

approximately June 2020, the intelligence network worked to

procure the services of private investigators in Canada under

5

false pretenses to locate and conduct surveillance on multiple
targets ("Victim-2," "Victim-3," and "Victim-4").  The network
falsely represented that the purpose of the surveillance
assignment was to locate debtors for a private client located in
the Middle East, and retained private investigators who took
surveillance photographs and videos of the targets' work and
residences and conducted background research on their families,
professions, and assets.  Similarly, beginning in at least
approximately September 2020, the intelligence network worked to
procure the services of private investigators in the United
Kingdom under false pretenses to conduct surveillance on an
Iranian expatriate journalist and political commentator
("Victim-5").  The network retained a private investigations
firm that took surveillance photographs of Victim-5's residence.
FARAHANI has also tasked individuals with conducting
surveillance and obtaining photographs of targets located in the
UAE.

        9.   MAHMOUD KHAZEIN, the defendant, is a resident of
Iran and an intelligence asset of the Government of Iran.
KHAZEIN is the chief executive of a group of companies that
imports marine, construction, and agricultural equipment to
Iran, principally for Iranian government entities.  KHAZEIN was
appointed to a position in the Basij, a volunteer auxiliary
division of the Islamic Revolutionary Guard Corps, in or about

1999.  KHAZEIN was also named Head of the Office of Ceremonies at the General Office of International Affairs for Iran's Expediency Council in or about 2016 and has served as an expert advisor to the MOIS with respect to the construction of a National University for Intelligence and Security.  KHAZEIN has cooperated with Iranian intelligence agencies since at least approximately 2014.

        a.   In furtherance of the plot to kidnap Victim-1, KHAZEIN researched Victim-1 and Victim-1's residence in Brooklyn, New York.  KHAZEIN also researched travel routes from Victim-1's residence to waterfront neighborhoods in Brooklyn, New York and the location of Victim-1's residence relative to South America.

        b.   KHAZEIN exchanged communications about, and received surveillance results from, the network's targeting of Victims-2, -3, and -4 in Canada and Victim-5 in the United Kingdom.

        10.   KIYA SADEGHI, the defendant, is a resident of Iran.  SADEGHI researched and hired private investigators in the United States, Canada, and the United Kingdom using false pretenses: SADEGHI falsely claimed that he worked for a company located in Dubai and was looking for individuals who owed money to or who had stolen money from his client.  In this manner,

SADEGHI concealed his true purpose, which was to procure surveillance services for an Iranian intelligence agency.

a.   SADEGHI is the point of contact for communications with these private investigators, received the results of the surveillance and shared it with his co-conspirators, and laundered money from Iran to the United States to pay for the surveillance.

b.   SADEGHI also researched maritime travel routes from Victim-1's residence to South America and a business providing maritime travel services out of Manhattan, New York.

11.   Defendant OMID NOORI is a resident of Iran. NOORI facilitated payment to a private investigator in the United States; received the results of surveillance of targets of the Government of Iran from KIYA SADEGHI, the defendant, including surveillance photographs and videos of Victim-1 and from the network's targeting of Victims-2, -3, and -4 in Canada; and communicates with an individual involved in the procurement of surveillance of Victim-5 in the United Kingdom.

12.   NILOUFAR BAHADORIFAR, a/k/a "Nellie," the defendant, is originally from Iran and is currently a resident of California, where she is employed at a department store. BAHADORIFAR has provided financial and other services from the United States to Iranian residents and entities, including to MAHMOUD KHAZEIN, the defendant, since at least in or about 2015,

8

including access to the U.S. financial system and U.S. financial
institutions through the use of card accounts, and has offered
to manage business interests in the United States on KHAZEIN's
behalf.  Among other things, BAHADORIFAR caused a payment to a
private investigator for surveillance of Victim-1 on KHAZEIN's
behalf.  Since approximately July 2020, when the network began
procuring surveillance of Victim-1 and Victim-1's household,
BAHADORIFAR has made more than approximately $472,000 in
unexplained cash deposits to BAHADORIFAR's bank account,
including approximately 98 cash deposits that were each
individually less than $10,000 but which totaled more than
approximately $444,000.

## Iranian Intelligence Services

13.  The MOIS was designated on or about February 16,
2012, by the U.S. Department of Treasury, Office of Foreign
Assets Control ("OFAC"), as a Specially Designated National
("SDN") under Executive Orders Nos. 13224, 13553, and 13572 for
being responsible for or complicit in the commission of serious
human rights abuses against the Iranian people and Syrian people
and for its support to terrorist groups, including al Qaeda, al
Qaeda in Iraq, Hizballah, and Hamas.  According to OFAC, the
MOIS has played a key role in the Iranian regime's brutal human
rights abuses against the Iranian people.  MOIS agents are
responsible for beatings, sexual abuse, prolonged

interrogations, and coerced confessions of prisoners,
particularly political prisoners.  MOIS has employed mock
executions and forms of sexual violence in its interrogations of
prisoners, and its agents have arrested and detained members of
the Baha'i religion without charges.

14.   Mahmoud Alavi, the Iranian Minister of
Intelligence and head of MOIS, was designated on or about
November 18, 2020, by OFAC under Executive Order No. 13553 for
having acted or purported to act for or on behalf of, directly
or indirectly, the MOIS.

**COUNT ONE**

**(Conspiracy to Kidnap)**

The Grand Jury charges:

15.   The allegations contained in paragraphs 1 through
14 of this Indictment are repeated and realleged as if fully set
forth herein.

16.   From at least in or about June 2020, up to and
including in or about 2021, in the Southern District of New York
and elsewhere, ALIREZA SHAHVAROGHI FARAHANI, a/k/a "Vezarat
Salimi," a/k/a "Haj Ali," MAHMOUD KHAZEIN, KIYA SADEGHI, and
OMID NOORI, the defendants, and others known and unknown,
willfully and knowingly combined, conspired, confederated, and
agreed together and with each other to violate Title 18, United
States Code, Section 1201.

10

17.   It was a part and an object of the conspiracy that ALIREZA SHAHVAROGHI FARAHANI, a/k/a "Vezarat Salimi," a/k/a "Haj Ali," MAHMOUD KHAZEIN, KIYA SADEGHI, and OMID NOORI, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, would and did unlawfully seize, confine, inveigle, decoy, kidnap, abduct, and carry away and hold for ransom and reward and otherwise a person, which person would be willfully transported in interstate and foreign commerce, and an offender would travel in interstate and foreign commerce, and would use the mail and any means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, to wit, the defendants plotted to kidnap Victim-1 from New York City for rendition to Iran.

**Overt Acts**

18.   In furtherance of the conspiracy and to effect the illegal object thereof, ALIREZA SHAHVAROGHI FARAHANI, a/k/a "Vezarat Salimi," a/k/a "Haj Ali," MAHMOUD KHAZEIN, KIYA SADEGHI, and OMID NOORI, the defendants, and their co-conspirators committed the following overt acts, among others:

### The Co-Conspirators Procure the Services of a New York Private Investigator

a.   On or about June 27, 2020, SADEGHI searched an online map service for the address of Victim-1's residence in New York City ("the Residence").

b.   KHAZEIN obtained screenshots of images of the Residence and the surrounding street from an online real estate listing service.  KHAZEIN also obtained a screenshot of a map pinpointing the address of the Residence.

c.   On or about July 14, 2020, SADEGHI, from Iran, contacted a private investigator with an office located in Manhattan ("Investigator-1") through Investigator-1's website, inquiring about the cost of conducting surveillance of a person in New York, New York.  SADEGHI wrote: "I am contacting you on behalf of a client looking [for] a missing person from Dubai, UAE who has fled to avoid debt repayment. We require your services to conduct a surveillance on potential address of missing person. . . Will need high quality pictures/video of persons living in the address and cars they drive."[1]  As contact information, SADEGHI provided an email address and telephone number having a UAE country code.

---

[1] Throughout this Indictment, quoted text appears as in the original source, including any typographical errors, except where alterations are indicated.

12

d.     Also on or about July 14, 2020, after

receiving Investigator-1's response to SADEGHI's inquiry,

SADEGHI, from Iran, sent Investigator-1 a reply email

identifying the Residence and asking about the cost of

Investigator-1 providing pictures of the persons living there.

e.     On or about July 15, 2020, after receiving a

price proposal from Investigator-1, SADEGHI sent Investigator-1

an email from Iran stating that SADEGHI would "discuss with my

client."

f.     On or about July 16, 2020, SADEGHI sent

Investigator-1 an email stating, "My client has accepted your

offer," and asking to make payment through a U.S.-based online

payment application (the "Payment App").

g.     On or about July 17, 2020, SADEGHI sent an

electronic message to NOORI with Investigator-1's Payment App

payment information.

h.     Later on or about July 17, 2020, NOORI sent

an electronic message to NILOUFAR BAHADORIFAR, a/k/a "Nellie,"

the defendant, with the Investigator-1 Payment App information

NOORI had received from SADEGHI.

i.     Later on or about July 17, 2020, KHAZEIN

caused BAHADORIFAR to cause a payment of approximately $670 to

be made by the Payment App to Investigator-1, with the payment

description, "Requested from Mr.  M.  Khazein."

13

j.    Later on or about July 17, 2020, BAHADORIFAR sent NOORI an electronic message attaching a screenshot of the Payment App transaction confirmation for the payment of $670 to Investigator-1.

k.    On or about July 19, 2020, NOORI sent SADEGHI the Payment App transaction confirmation he had received from BAHADORIFAR.

l.    On or about July 19, 2020, SADEGHI sent Investigator-1 an email from Iran attaching a screenshot of the Payment App transaction confirmation for the payment of $670 to Investigator-1.

m.    On or about July 19, 2020, SADEGHI sent Investigator-1 an email from Iran about the surveillance assignment, asking Investigator-1 to "kindly be discreet as they are on the look out" and requesting "Photos of faces and cars (license plates) residing at residence, and if possible picture of envelopes in mail box with names of tenants."

### July 2020 Surveillance

n.    On or about July 22, 2020, SADEGHI received an email from Investigator-1 advising that the surveillance had started and attaching a photograph of the exterior of the Residence.  SADEGHI sent Investigator-1 an email from Iran requesting "any video footage," "along with any extra picture."

o.   On or about July 23, 2020, SADEGHI sent several electronic messages to NOORI attaching photographs and videos of the surveillance of Victim-1's Residence.

p.   On or about August 1, 2020, SADEGHI sent Investigator-1 an email from Iran with "the following comments from client," claiming that the "main suspect is friend of [Victim-1]" and that "we need more surveillance of [Victim-1] and [Victim-1's] friend." SADEGHI also requested that "if [Victim-1] comes out . . . to follow [Victim-1] and see if [Victim-1] visits [Victim-1's] friend." Investigator-1 responded, stating Investigator-1's understanding that the subject of the investigation was Victim-1's friend and quoting a price for additional surveillance.

q.   On or about August 2, 2020, SADEGHI sent an email to Investigator-1 from Iran requesting a discount on the quoted price, and asking Investigator-1 to "consider the following requests from client," including:

> 1) high quality photos and video
>
> 2) We need video of Start, every consequent hour, and End
>
> 3) Dont wait on [Victim-1] if [Victim-1] goes to work and end assignment continue next day
>
> 4) 7am start time until 3 pm
>
> 5) please take many pictures of objects around house

15

      r.   On or about August 4, 2020, SADEGHI sent an email to Investigator-1 from Iran again requesting a price discount, claiming that "my client has had his investments stolen and legal expenses have been too costly."

      s.   On or about August 9, 2020, SADEGHI sent an email, in Farsi, to an Iranian electronic payment service (the "Iranian Payment Service"), a co-conspirator not named as a defendant herein, asking for the cost of sending $2,500 to America.

      t.   On or about August 10, 2020, SADEGHI sent an email to the Iranian Payment Service with contact and Payment App account information for Investigator-1 for the payment of "american dollars $2,500."

      u.   On or about August 10, 2020, the Iranian Payment Service caused three payments totaling approximately $2,450 to be made to Investigator-1's Payment App account from three fraudulent Payment App accounts, the account information of which had no information linking them to Iran.

### August 2020 Surveillance

      v.   On or about August 11, 2020, SADEGHI sent an email from Iran to Investigator-1 requesting two days of surveillance.  SADEGHI advised Investigator-1 to "be aware suspects have put security camera on neighbor's house."  SADEGHI further asked Investigator-1 to consider requests from SADEGHI's

16

"client" for "high quality photos and video;" "Video at Start, every hour, and End;" and to "please take pictures of objects around house."

       w.  On or about August 12, 2020, SADEGHI received an email from Investigator-1 stating that surveillance had resumed and attaching a photograph of the Residence ("Surveillance Photograph-1").  SADEGHI replied, asking Investigator-1 to "provide some quality pictures so that we can see license plate on car. Also please send two pictures and one video every hour."

       x.  On or about August 12, 2020, SADEGHI received an email from Investigator-1 attaching a photograph of Victim-1 in front of the Residence ("Surveillance Photograph-2").  SADEGHI replied, "good picture, please follow [Victim-1], we are looking for [Victim-1's] friend."

       y.  FARAHANI received copies of Surveillance Photograph-1 and Surveillance Photograph-2.

       z.  On or about August 13, 2020, SADEGHI received an email from Investigator-1 stating that surveillance had resumed.

       aa.  On or about August 14, 2020, SADEGHI received an email from Investigator-1 with a surveillance log for August 12 and 13, 2020, and attaching video recordings taken during the surveillance.

bb.   On or about August 16, 2020, SADEGHI
replied, reporting that his "client" was disappointed, among
other things, that the video recordings were not longer and that
there were not more pictures; "after 20 hours of surveillance he
expected 20 minutes of content."  SADEGHI also questioned why
Investigator-1 did not record a resident of the Residence moving
a car, the full interaction when a person knocked on the door of
the Residence, and Victim-1 going for a walk.

cc.   On or about August 16, 2020, SADEGHI
received a reply email from Investigator-1 responding that the
video recordings were provided as proof that the surveillance
was conducted but nothing of significance had occurred and that
the friend of Victim-1, who was purportedly the target of
surveillance, had not appeared.

### October 2020 Surveillance and Researching Kidnapping Routes

dd.   On or about September 16, 2020, SADEGHI
conducted Internet searches for "new york to caracas nautical
miles," "new york to caracas by boat," and "brooklyn new york to
caracas by boat," as depicted in Exhibit A-1 to this Indictment.
Caracas is the capital city of Venezuela.  At the time SADEGHI
conducted these searches, he was in Tehran, Iran.

ee.   KHAZEIN saved a screenshot of an online map
service showing a route from the Residence to a waterfront

18

neighborhood in Brooklyn, New York. KHAZEIN also saved (a) a screenshot of a map pinpointing the address of the Residence and showing the east coast of the United States, the Caribbean, and Venezuela, as depicted in Exhibit A-2 to this Indictment; and (b) a screenshot of a map pinpointing the address of the Residence and also showing Iran with a large dot in the location of Tehran.

ff. On or about September 17, 2020, SADEGHI sent an email from Iran to Investigator-1 stating that SADEGHI's "client" was interested in more surveillance, "but his main condition is that he gets lots of high quality pictures and videos of previous assignment. Atleast 10 pictures and 5 minutes of film for every hour of surveillance. He wants pictures of faces of everyone visiting the address, even if they are marketers and sales people." SADEGHI claimed this was to "help him find the suspect."

gg. On or about September 25, 2020, SADEGHI sent an email from Iran to Investigator-1 requesting two additional days of surveillance, with three hours on each day. Now referring to Victim-1 as the "suspect," SADEGHI reported that the "requirements" of his "client" were:

> 1) Atleast 5 minutes of video for each hour of surveillance and 10 pictures. Total content for 6 hours should be 30 minutes video footage and 60 pictures. (of [Victim-1], [Victim-1's] family and anyone visiting

19

the house)

2) follow them with camera on, when [Victim-1] is walking or gardening

3) video at start of assignment and another at end

4) if you are on a lead and [Victim-1] is visiting friend or doing something of interest, surveillance can be extended upto 3 hours and we will pay outstanding cost before sending us pictures/video

Pictures of everything and everyone, client wants lots of content even if you may think it is not of value.  Including all people, house objects and body language is of interest to client.

hh.  On or about September 26, 2020, SADEGHI sent an email from Iran to Investigator-1 confirming the interest in two additional days of three-hour surveillance.  SADEGHI also advised that "if you are following [Victim-1] and time is running out you can do all 6 hours in one day" and to "[p]lease extend upto 3-4 hours if [Victim-1] is doing something interesting or visiting friends, and you can also inform me if time runs out and we will confirm to continue, i will be on standby."  SADEGHI also reiterated "the importance of lots of high quality pictures and videos."

ii.  On or about October 3, 2020, the Iranian Payment Service sent an email to SADEGHI stating that $1,000 had been transferred to Investigator-1's Payment App account from a fraudulent Payment App account, the account information of which

20

had no information linking it to Iran, and attaching two screenshots of payment confirmation.

jj.   On or about October 3, 2020, SADEGHI sent an email from Iran to Investigator-1 attaching one of the screenshots of payment confirmation for the $1,000 transfer to Investigator-1's Payment App account.

kk.   On or about October 6, 2020, SADEGHI received an email from Investigator-1 stating that surveillance had resumed and attaching a photograph of the Residence.

ll.   On or about October 6, 2020, SADEGHI received an email from Investigator-1 with a surveillance log and a link to a file transfer site containing surveillance video and photographs relating to that day's surveillance.

mm.   On or about October 8, 2020, SADEGHI received an email from Investigator-1 with a surveillance log and a link to a file transfer site containing surveillance video and photographs relating to surveillance on October 6 and 7, 2020.

nn.   SADEGHI caused videos from the October 6 and 7, 2020 surveillance to be sent to NOORI.

oo.   On or about October 25, 2020, SADEGHI sent an email from Iran to Investigator-1 stating that SADEGHI's "client" wanted another eight hours of surveillance.

pp. On or about October 31, 2020, SADEGHI
conducted online research regarding a company in New York City
that provides emergency maritime evacuation services out of
Manhattan.

qq. On or about October 28 and 30 and November
2, 4, and 11, 2020, NOORI obtained videos from Victim-1's social
media account showing Victim-1 at locations away from the
Residence, including at an airport.

rr. On or about November 11, 2020, SADEGHI sent
an email from Iran to Investigator-1 stating that the "suspect
has gone out of town" and SADEGHI was not interested in
surveillance at that time.

### January and February 2021 Surveillance and
### Request for Live Video Monitoring of Victim-1

ss. On or about January 15, 2021, SADEGHI sent
an email from Iran to Investigator-1 requesting ten hours of
surveillance of the Residence.

tt. On or about January 20, 2021, SADEGHI sent
an email from Iran to Investigator-1 requesting four hours of
surveillance on January 25, 2021 and eight hours of surveillance
on the following day. SADEGHI stated that his "client has asked
for the same amount of pictures and video footage, for every
hour 3 minutes of film and 10 pictures," and also requested
photographs of everyone visiting the Residence.

22

uu.   On or about January 24, 2021, SADEGHI caused money denominated in Iranian currency to be transferred to the Iranian Payment Service to pay for a Payment App transfer to Investigator-1.

vv.   On or about January 25, 2021, SADEGHI sent an email from Iran to Investigator-1 attaching a screenshot of a payment confirmation for a $500 transfer to Investigator-1's Payment App account.

ww.   On or about January 25, 2021, SADEGHI received an email from Investigator-1 stating that surveillance had started and attaching two photographs of the Residence and the intersection at the end of the block.

xx.   Later on or about January 25, 2021, SADEGHI sent an email from Iran to Investigator-1 requesting nine hours of surveillance the following day and advising that SADEGHI would transfer additional funds.  SADEGHI stated, "As im having some delays in transferring, can you do the job and give us pictures after payment received."

yy.   On or about February 1, 2021, SADEGHI received an email from the Iranian Payment Service attaching two images of Payment App payment confirmations to Investigator-1 totaling approximately $1,100.

23

zz. Later on or about February 1, 2021, SADEGHI sent an email from Iran to Investigator-1 attaching the Payment App payment confirmations totaling approximately $1,100.

aaa. On or about February 6, 2021, SADEGHI received an email from the Iranian Payment Service attaching an image of a Payment App payment confirmation to Investigator-1 for approximately $156.

bbb. On or about February 6, 2021, SADEGHI sent an email from Iran to Investigator-1 attaching the Payment App payment confirmation for approximately $156. SADEGHI requested nine hours of surveillance with "a picture and 1 min video for every hour."

ccc. On or about February 9, 2021, SADEGHI sent an email from Iran to Investigator-1 stating that SADEGHI's "client" was "asking if its possible to park a car infront of address with camera inside to provide live video?"

ddd. Later on or about February 9, 2021, SADEGHI sent an email from Iran to Investigator-1 stating that the "car surveillance would be another job, generally asking is it possible for you to arrange a camera in car for live surveillance?"

eee. Later on or about February 9, 2021, SADEGHI sent an email from Iran to Investigator-1 confirming that the

request for live video surveillance was for the Residence, and asked if Investigator-1 could use "a discreet 4k camera."

fff. On or about February 9, 2021, SADEGHI received an email from Investigator-1 advising that the only people observed were the same residents seen previously.

ggg. On or about February 11, 2021, SADEGHI sent an email from Iran to Investigator-1 asking, "Can you please urgently send the part of video where you have seen suspects. Client insists to know who is was asap."

(Title 18, United States Code, Section 1201(c).)

## COUNT TWO

### (Conspiracy to Violate the
### International Emergency Economic Powers Act)

The Grand Jury further charges:

19. The allegations contained in paragraphs 1 through 14 and 18 of this Indictment are repeated and realleged as if fully set forth herein.

## The International Emergency Economic Powers Act

20. The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701 to 1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate,

25

attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a).

21. Beginning with Executive Order No. 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States" and declared "a national emergency to deal with that threat."

### The Iranian Transactions and Sanctions Regulations

22. On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous orders (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013 the Iranian Transactions and Sanctions Regulations, or "ITSR"), implementing the sanctions imposed by the Executive Orders.

26

23. Title 31, Code of Federal Regulations, Section 560.204 of the ITSR prohibits, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale, or supply of goods, technology, or services to a third country knowing that such goods, technology, or services are intended for Iran or the Government of Iran, without a license from OFAC.

24. The ITSR provide that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, reexport, sale, or supply of services to Iran or the Government of Iran. See 31 C.F.R. § 560.427(a).

25. The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR. See 31 C.F.R. § 560.203.

### The Global Terrorism Sanctions Regulations

26. On September 23, 2001, the President issued Executive Order No. 13224, providing that all property and interests in property in the United States of persons determined to have committed or to pose a significant risk of committing

acts of terrorism that threaten U.S. nationals or the national

security, foreign policy, or economy of the United States, or

determined to act for or on behalf of such persons or to assist

in, sponsor, or provide financial, material, or technological

support for, or financial or other services to or in support of,

such acts of terrorism or such persons (Specially Designated

Global Terrorists, "SDGT") is blocked.  Executive Order No.

13224 authorized the United States Secretary of the Treasury to

promulgate rules and regulations necessary to carry out the

Executive Order.  Pursuant to this authority, the Secretary of

the Treasury promulgated the Global Terrorism Sanctions

Regulations ("GTSR"), implementing the sanctions imposed by the

Executive Order.

27.  Title 31, Code of Federal Regulations, Section

594.201(a) of the GTSR provides, in relevant part:

> [P]roperty and interests in property of
> [SDGTs] that are in the United States, that
> hereafter come within the United States, or
> that hereafter come within the possession or
> control of U.S. persons, including their
> overseas branches, are blocked and may not
> be transferred, paid, exported, withdrawn or
> otherwise dealt in . . . .

28.  Section 594.204 of the GTSR further prohibits any

U.S. person from engaging in any transaction or dealing in

property or interests in property of persons whose property or

interests in property are blocked pursuant to the GTSR.

29.  Section 594.205 of the GTSR further prohibits attempts and conspiracies to violate or to evade the prohibitions of the GTSR.

30.  As alleged in paragraph 13, supra, MOIS has been designated an SDGT pursuant to Executive Order No. 13224.

### Statutory Allegations

31.  From at least in or about 2015, up to and including in or about 2021, in the Southern District of New York and elsewhere, ALIREZA SHAHVAROGHI FARAHANI, a/k/a "Vezarat Salimi," a/k/a "Haj Ali," MAHMOUD KHAZEIN, KIYA SADEGHI, OMID NOORI, and NILOUFAR BAHADORIFAR, a/k/a "Nellie," the defendants, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the IEEPA.

32.  It was a part and an object of the conspiracy that ALIREZA SHAHVAROGHI FARAHANI, a/k/a "Vezarat Salimi," a/k/a "Haj Ali," MAHMOUD KHAZEIN, KIYA SADEGHI, OMID NOORI, and NILOUFAR BAHADORIFAR, a/k/a "Nellie," the defendants, and others known and unknown, would and did provide and cause others to provide services to Iran and to the Government of Iran from the United States and by U.S. persons, without first obtaining the required approval of OFAC, and to evade the requirements of U.S. law with respect to the provision of services to Iran and to the

29

Government of Iran from the United States and by U.S. persons,

in violation of Executive Order Nos. 12959, 13059, and 13224;

Part 31 of the Code of Federal Regulations, Sections 560.203,

560.204, and 560.205; and Part 31 of the Code of Federal

Regulations, Sections 594.201, 594.204, and 594.205.

(Title 50, United States Code, Section 1705;
Executive Orders 12959, 13059, & 13224; Title 31, Code of
Federal Regulations, Sections 560.203, 560.204, 560.205,
594.201, 594.204, & 594.205.)

### COUNT THREE

**(Conspiracy to Commit Bank and Wire Fraud)**

The Grand Jury further charges:

33.   The allegations contained in paragraphs 1 through

14 and 18 of this Indictment are repeated and realleged as if

fully set forth herein.

34.   From at least in or about 2015, up to and

including in or about 2021, in the Southern District of New York

and elsewhere, ALIREZA SHAHVAROGHI FARAHANI, a/k/a "Vezarat

Salimi," a/k/a "Haj Ali," MAHMOUD KHAZEIN, KIYA SADEGHI, OMID

NOORI, and NILOUFAR BAHADORIFAR, a/k/a "Nellie," the defendants,

and others known and unknown, knowingly and willfully combined,

conspired, confederated, and agreed together and with each other

to commit bank fraud, in violation of Title 18, United States

Code, Section 1344, and wire fraud, in violation of Title 18,

United States Code, Section 1343.

30

35. It was a part and an object of the conspiracy that ALIREZA SHAHVAROGHI FARAHANI, a/k/a "Vezarat Salimi," a/k/a "Haj Ali," MAHMOUD KHAZEIN, KIYA SADEGHI, OMID NOORI, and NILOUFAR BAHADORIFAR, a/k/a "Nellie," the defendants, and others known and unknown, would and did knowingly and willfully execute and attempt to execute a scheme or artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation ("FDIC"), in violation of Title 18, United States Code, Section 1344.

36. It was further a part and an object of the conspiracy that ALIREZA SHAHVAROGHI FARAHANI, a/k/a "Vezarat Salimi," a/k/a "Haj Ali," MAHMOUD KHAZEIN, KIYA SADEGHI, OMID NOORI, and NILOUFAR BAHADORIFAR, a/k/a "Nellie," the defendants, and others known and unknown, would and did knowingly and willfully execute and attempt to execute a scheme or artifice to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, the deposits of which were then insured by the FDIC, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

37. It was further a part and an object of the conspiracy that ALIREZA SHAHVAROGHI FARAHANI, a/k/a "Vezarat Salimi," a/k/a "Haj Ali," MAHMOUD KHAZEIN, KIYA SADEGHI, OMID

31

NOORI, and NILOUFAR BAHADORIFAR, a/k/a "Nellie," the defendants, and others known and unknown, having devised and intending to devise a scheme or artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

### COUNT FOUR

### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

38.   The allegations contained in paragraphs 1 through 14 and 18 of this Indictment are repeated and realleged as if fully set forth herein.

39.   From at least in or about 2015, up to and including in or about 2021, in the Southern District of New York and elsewhere, ALIREZA SHAHVAROGHI FARAHANI, a/k/a "Vezarat Salimi," a/k/a "Haj Ali," MAHMOUD KHAZEIN, KIYA SADEGHI, OMID NOORI, and NILOUFAR BAHADORIFAR, a/k/a "Nellie," the defendants, and others known and unknown, intentionally and knowingly combined, conspired, confederated, and agreed together and with

each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

40.   It was a part and an object of the conspiracy that ALIREZA SHAHVAROGHI FARAHANI, a/k/a "Vezarat Salimi," a/k/a "Haj Ali," MAHMOUD KHAZEIN, KIYA SADEGHI, OMID NOORI, and NILOUFAR BAHADORIFAR, a/k/a "Nellie," the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds to places in the United States from and through places outside the United States, and to places outside the United States from and through places in the United States, in amounts exceeding $10,000, with the intent to promote the carrying on of specified unlawful activity, to wit, (a) the conspiracy to kidnap as charged in Count One of this Indictment, (b) the conspiracy to illegally export services to Iran as charged in Count Two of this Indictment, and (c) bank and wire fraud, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Section 1956(h).)

## COUNT FIVE

### (Structuring)

The Grand Jury further charges:

41. The allegations contained in paragraphs 1 through 14 and 18 of this Indictment are repeated and realleged as if fully set forth herein.

42. From at least in or about 2019, up to and including in or about 2021, in the Southern District of New York and elsewhere, NILOUFAR BAHADORIFAR, a/k/a "Nellie," the defendant, for the purpose of evading a cash transaction reporting requirement, did structure and assist in structuring, and attempt to structure and assist in structuring, transactions with one or more domestic financial institutions while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit, between at least approximately April 2019 and May 2021, BAHADORIFAR structured cash deposits totaling at least approximately $505,822 at a financial institution in individual deposits of less than $10,000 each.

(Title 31, United States Code, Section 5324(a)(3), (d)(2); Title 31, Code of Federal Regulations, Section 1010.311.)

34

## FORFEITURE ALLEGATION

### (Counts One, Two and Three)

43.  As a result of committing the kidnapping, IEEPA, and bank and wire fraud offenses alleged in Counts One, Two, and Three of this Indictment, ALIREZA SHAHVAROGHI FARAHANI, a/k/a "Vezarat Salimi," a/k/a "Haj Ali," MAHMOUD KHAZEIN, KIYA SADEGHI, OMID NOORI, and NILOUFAR BAHADORIFAR, a/k/a "Nellie," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One, Two, and Three of this Indictment, including but not limited to a sum of money representing the amount of proceeds obtained as a result of the offenses.

### Substitute Assets Provision

44.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        a)   cannot be located upon the exercise of due diligence;

        b)   has been transferred or sold to, or deposited with, a third person;

        c)   has been placed beyond the jurisdiction of the court;

        d)   has been substantially diminished in value; or

        e)    has been commingled with other property
            which cannot be subdivided without
            difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p) and Title 28, United States

Code, Section 2461(c), to seek forfeiture of any other property

of said defendants up to the value of the above forfeitable

property.

### FORFEITURE ALLEGATION

### (Count Four)

45.  As a result of committing the money laundering

offense alleged in Count Four of this Indictment, ALIREZA

SHAHVAROGHI FARAHANI, a/k/a "Vezarat Salimi," a/k/a "Haj Ali,"

MAHMOUD KHAZEIN, KIYA SADEGHI, OMID NOORI, and NILOUFAR

BAHADORIFAR, a/k/a "Nellie," the defendants,  shall forfeit to

the United States, pursuant to Title 18, United States Code,

Section 982(a)(1), all property, real and personal, involved in

the money laundering offense and all property traceable to such

property, including but not limited to, a sum of money

representing the amount of property that was involved in the

money laundering offense or is traceable to such property.

### Substitute Assets Provision

46.  If any of the above-described forfeitable

property, as a result of any act or omission of the defendants:

36

a)     cannot be located upon the exercise of due diligence;

b)     has been transferred or sold to, or deposited with, a third person;

c)     has been placed beyond the jurisdiction of the court;

d)     has been substantially diminished in value; or

e)     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

## FORFEITURE ALLEGATION

### (Count Five)

47. As a result of committing the structuring offense alleged in Count Five of this Indictment, NILOUFAR BAHADORIFAR, a/k/a "Nellie," the defendant, shall forfeit to the United States, pursuant to Title 31, United States Code, Section 5317(c) and Title 21, United States Code, Section 853, any and all property, real and personal, involved in the offense and any property traceable thereto, including but not limited to a sum of money representing the amount of proceeds obtained as a result of the offense.

37

## Substitute Assets Provision

48.   If any of the above-described forfeitable

property, as a result of any act or omission of the defendant:

a)   cannot be located upon the exercise of due
diligence;

b)   has been transferred or sold to, or
deposited with, a third person;

c)   has been placed beyond the jurisdiction of
the court;

d)   has been substantially diminished in value;
or

e)   has been commingled with other property
which cannot be subdivided without
difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p) and Title 31, United States

Code, Section 5317(c), to seek forfeiture of any other property

of said defendant up to the value of the above forfeitable

property.

(Title 18, United States Code, Sections 981, 982;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

Foreperson

AUDREY STRAUSS
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**v.**

**ALIREZA SHAHVAROGHI FARAHANI, a/k/a**
**"Vezarat Salimi," a/k/a "Haj Ali,"**
**MAHMOUD KHAZEIN,**
**KIYA SADEGHI,**
**OMID NOORI, and**
**NILOUFAR BAHADORIFAR, a/k/a "Nellie,"**

**Defendants.**

**SEALED**
**SUPERSEDING INDICTMENT**

S1 21 Cr. 430 (RA)

(18 U.S.C. §§ 1201, 1349, 1956, & 2; 31
U.S.C. § 5324; 50 U.S.C. § 1705; 31
C.F.R. §§ 1010.311, 560.203, 560.204,
560.205, 594.201, 594.204, & 594.205.)

AUDREY STRAUSS,
United States Attorney.

**A TRUE BILL**

_____
Foreperson.

7/2/21   FILED INDICTING WARRANTS ISSUED
COPY USMJ

EXHIBIT A-1

Searched for brooklyn new york to caracas by boat

Sep 16, 2020, 8:11:30 AM UTC

**Products:**
   Search


Searched for new york to caracas by boat

Sep 16, 2020, 8:12:03 AM UTC

**Products:**
   Search


Searched for new york to caracas nautical miles

Sep 16, 2020, 8:13:15 AM UTC

**Products:**
   Search

EXHIBIT A-2